# FIFTH AVENUE CORPORATION, *Respondent,*
*v.*
# WASHINGTON COUNTY, *Petitioner.*
## (TC 35-107, CA 5444, SC 25233)
### 581 P2d 50

[ 592 ]

Lawrence R. Derr, Hillsboro, argued the cause and submitted a brief for petitioner.

Stephen T. Janik, Portland, argued the cause for respondent. With him on the brief were Davies, Biggs, Strayer, Stoel and Boley, Portland.

Frank C. McKinney, Salem, filed an amicus curiae brief for League of Oregon Cities and Association of Oregon Counties.

LENT, J.

**LENT, J.**

Plaintiff is an Oregon corporation which owns approximately 20 acres of undeveloped land (subject property) in an unincorporated area of Washington County. When plaintiff purchased the subject property in 1965, its zoning designation allowed the construction of a "district shopping center"[1] of the type which plaintiff was planning to build.

On November 6, 1973, the Washington County Board of Commissioners (Board) enacted Zoning Ordinance 125, which extensively revised the zoning system of the whole county. The new designation of the subject property no longer allowed uses as intensive as a district shopping center. On November 27, 1973, the Board adopted a new Comprehensive Plan (1973 Plan), which designated various parcels of the subject property "medium density residential," "neighborhood commercial," "greenway area," and "transit station." On October 14, 1975, plaintiff applied to the county for a building permit to construct a district shopping center. The county denied the application on the ground that such use was not allowed under Ordinance 125.

On December 23, 1974, plaintiff sought a declaratory judgment that both the 1973 Plan and Ordinance 125 *in their entirety and as applied* to the subject property were invalid. In addition, plaintiff sought damages for inverse condemnation. The county and its board members were named as defendants. In this opinion, reference to "defendants" or "defendant" will be to Washington County unless otherwise indicated.

Plaintiff attacked the validity of the 1973 Plan on three bases. Firstly, plaintiff alleged there was inadequate public notice of the Board hearing at which the

---

[1]A "district shopping center," as described in the comprehensive plan which applied to the subject property before 1973 (Northeast Plan), was defined as "a commercial center" of approximately 25-40 acres, in the vicinity of a freeway or major highway, with tenants consisting of a junior department store, extensive grocery, variety, pharmacy-drug and specialty stores.

[ 593 ]

1973 Plan was adopted. This, plaintiff asserted, violated the 9th and 14th Amendments to the U. S. Constitution; Art I, §§ 1, 10, 18, 20 and 33 of the Oregon Constitution; and ORS 215.060.[2]

Secondly, plaintiff cited the failure of the Board to request a Planning Commission report on the 1973 Plan before adoption, in violation of ORS 215.110(3).

Finally, plaintiff asserted that the formalities observed by the Board in its plan adoption procedures were improper under ORS 215.050 and the Washington County Charter. The trial court found against plaintiff on each of the three theories.

Plaintiff's attack on Ordinance 125 in its entirety was based on inadequate public notice of the Board meeting at which the ordinance was considered and enacted. Again, plaintiff relied at trial on the 9th and 14th Amendments to the U. S. Constitution; Art I, §§ 1, 10, 18 and 33 of the Oregon Constitution; and ORS 215.060.

Plaintiff also asserted the constitutional invalidity of the 1973 Plan and Ordinance 125 *as applied to the subject property* in that they were "arbitrary, capricious [and] unreasonable." This attack was based, again, on the above-cited sections of the United States and Oregon Constitutions. The trial court granted defendant's motion for partial summary judgment on this issue, holding that plaintiff had not exhausted its administrative remedies.

Finally, plaintiff sought damages in the form of just compensation for a "taking" of the subject property (or parts thereof) under the 5th and 14th Amendments to the U. S. Constitution and Art I, §§ 10 and 18,

---

[2] Plaintiff appeared to abandon the constitutional arguments on appeal and relied exclusively on ORS 215.060. The use of this type of generalized constitutional attack without reference to specific textual provisions has been persuasively criticized in Linde, "Without Due Process," 49 Or L Rev 125 (1969). Justice (then Professor) Linde was especially critical of "due process" arguments based on the sections of the Oregon Constitution cited by the plaintiff. *Id* at 135-146. *See, infra,* note 10 for text of ORS 215.060.

of the Oregon Constitution. The trial court sustained defendants' demurrer to this claim.

Plaintiff appealed each of the trial court's rulings to the Court of Appeals, which held[3] that (1) the notice of the Ordinance 125 hearing was adequate; (2) the 1973 Plan was invalid in its entirety based on improper formalities; (3) plaintiff's claims of the unconstitutional application of Ordinance 125 were without merit; and (4) the doctrine of exhaustion of administrative remedies was not applicable. The case was ordered to be remanded.

We allowed defendants' petition for review to address the issues of the validity of the 1973 Plan *in its entirety* and plaintiff's right to test its validity *as applied* under the doctrine of exhaustion.

## *I. VALIDITY OF THE 1973 PLAN*

There is no dispute that the 1973 Plan was not adopted by a document denominated "Ordinance." The Court of Appeals reasoned that this failure in formalities rendered the 1973 Plan invalid. In part this was based on a construction of ORS 215.050 (1973), which provides:

"The county governing body shall adopt and may from time to time revise a comprehensive plan and zoning, subdivision and other ordinances for the use of some or all the land in the county. The plan and related ordinances may be adopted and revised part by part."

This language, according to the Court of Appeals, 28 Or App 485, 490-491, requires that all comprehensive plans in the state of Oregon[4] be adopted or more

---

[3] *Fifth Avenue Corp. v. Washington Co.,* 28 Or App 485, 560 P2d 656 (1977).

[4] The statute requiring cities to "adopt" comprehensive plans is ORS 197.175(2), which provides, in pertinent part:

"Pursuant to [state statute], each city and county in this state shall:

"(a) Prepare and adopt comprehensive plans * * *"

As indicated by this provision, cities and counties are subject to the same requirements.

[ 595 ]

properly enacted by "ordinance," as opposed to "resolution," as was the case with the 1973 Plan. This analysis, were it left to stand, would call into question the validity of every post-1973 comprehensive plan not adopted by ordinance.[5]

■  The problem at hand is one of statutory construction, which, of course, is nothing more than the judicial process of discerning and declaring the intent of the legislature. ORS 174.010; ORS 174.020; *State ex rel Cox v. Wilson,* 277 Or 747, 750, 562 P2d 172 (1977).

The text of ORS 215.050 gives no indication that the legislature intended it to compel counties to observe strict ordinance formalities in the adoption of a comprehensive plan. The legislative history of this section reinforces this construction. In 1963 the legislature amended ORS 215.050 to read as follows:[6]

"The commission shall adopt and may from time to time revise a comprehensive plan for the use of some or all of the land in the county. The plan may be adopted and revised part by part." 1963 Or Laws 619 § 4.

Reference to the "commission" was to the County Planning Commission, which, until 1973, was the body authorized and required to adopt a comprehensive plan. In 1973, a bill was introduced in the Oregon House of Representatives, HB 2548, to overhaul the county land use planning statute. Section 6 of HB 2548 provided:

"ORS 215.050 is amended to read:

"215.050. The *governing body of the county* [commission] shall adopt and may from time to time revise a comprehensive plan, *prepared by the planning commission,* for the use of some or all of the land in the county. The plan may be adopted and revised part by part."

---

[5] In a survey conducted by the Land Conservation and Development Commission and the Bureau of Governmental Research of the University of Oregon, it was reported that at least eight county comprehensive plans were adopted by resolution rather than by ordinance. In addition, 35 of 39 city comprehensive plans surveyed were adopted by resolution.

[6] For the pre-1963 text of ORS 215.050, *see* n. 8 *infra.*

There was no reference to ordinances, and the only purpose of this section appears to have been to transfer the duty of promulgating a comprehensive plan from the planning commission to the county governing board.

When HB 2548 emerged from the House Committee on Local Government and Urban Affairs on May 19, 1973, the section in question (now Section 4) took the following form:.

> "The [commission] *county governing body* shall adopt and may from time to time revise a comprehensive plan *and zoning, subdivision and other ordinances* for the use of some or all of the land in the county. The plan *and related ordinances* may be adopted and revised part by part."

Testimony in the House committee indicated that the "primary thrust of the whole bill" was to address the problem of planning commission abuse and conflicts of interest. *See, e.g.,* 1973 Or Laws, ch 552, §§ 2, 9 and 10. This legislative purpose is reinforced by the numerous references in the testimony to our opinion in *Fasano v. Washington County Commissioners,* 264 Or 574, 507 P2d 23 (1973), which was decided on March 2, 1973. In that opinion we expressed strong disapproval for the abuses which until that time had been inherent in land use decision making, and we mandated quasi-judicial hearings in land use matters before an impartial tribunal with no ex parte contacts, 264 Or at 588. There is no indication from either the language of the statute or the legislative history of the 1973 amendments that the legislature intended that its amendment of ORS 215.050 was to be construed as requiring the county governing body to adopt a comprehensive plan with strict ordinance formalities.

■ In the construction of amendatory acts, it is presumed that material changes in language create material changes in meaning. 1A Sutherland, Statutory Construction, § 22.30 (1972). It is also said that a presumption exists that amendatory acts do not change the meaning of preexisting language further

than is expressly declared or necessarily implied. *Id.* The word "adopt" in ORS 215.050, whose meaning under the pre-1973 statute could not have been "enact by ordinance," was retained in the post-1973 version. A change in that meaning is not expressly declared nor necessarily implied by the 1973 amendments.

■ For the foregoing reasons, we hold that ORS 215.050 does not require the county governing body to follow strict ordinance formalities in the adoption of a comprehensive plan. However, this does not give that body carte blanche to adopt a comprehensive plan under any procedure it sees fit. In *Baker v. City of Milwaukie,* 271 Or 500, 513-514, 533 P2d 772 (1975), we held that comprehensive plans are "legislative and permanent in nature." Thus, they are subject to the procedural requirements prescribed for legislative actions of the Washington County Board of Commissioners. Since it is the people of Washington County who have authorized their governing body to enact legislation in their charter, we must now look at that charter to determine the procedures mandated for comprehensive plan adoption.

The Court of Appeals invalidated the 1973 Plan on the alternative ground of lack of authority in the Washington County Charter (Charter) for the procedures used to adopt the 1973 Plan. This court agrees that the validity of these procedures must be determined by the authority delegated by the people of Washington County in the Charter to its governing body. However, we do not agree that this analysis results in striking down the 1973 Plan.

At the time the 1973 Plan was adopted, the Washington County Charter made no express provision for the procedures required to adopt a comprehensive plan.[7] Section 20 of the Charter, entitled "General

---

[7] In 1976 a new chapter was added to the Charter which set out detailed procedures for the consideration and adoption of comprehensive plans. Washington County Charter, Chapter X.

Grant of Powers," contains a nonexclusive list of powers of the county. The list includes:

"(f) Enacting and enforcing planning and zoning ordinances and regulations in any part or all of the county outside cities."

The distinction in this section between ordinances and regulations calls our attention to the fact that it may well have been envisioned by the charter that the adoption of a comprehensive plan is a type of "regulation" rather than ordinance. This is especially true since, under state law at the time of the adoption of the Washington County Charter in 1962, comprehensive plans were to be adopted by county planning commissions,[8] which could not legally enact an ordinance.

◾ The Charter, with regard to the procedures mandated for the adoption of comprehensive plans, is ambiguous. Who is charged with resolving this ambiguity and determining the proper procedures by which the Board is authorized to adopt a comprehensive plan? The courts are finally responsible, but we believe that it is the Board itself, composed as it is of popularly elected local officials directly accountable to their constituency, the people of Washington County, that, in the first instance, should have the power and right to interpret local enactments. *Cf. Green v. Hayward,* 275 Or 693; 706, 552 P2d 815 (1976) (interpretation of county comprehensive plan).

While the interpretation of the Board cannot supplant our duty, that interpretation is entitled to some

---

[8] ORS 215.050(1) in 1962 provided in pertinent part:

"For the purpose of furthering the health, safety and general welfare of the people of the county, the *county planning commission* shall make and adopt a development pattern for the physical and economic development of the county, or any portion of the county, including surface mining." (emphasis added)

ORS 215.110(1) in 1962 provided in pertinent part:

"The *commission* may, for the benefit and welfare of the county, prepare and submit to the governing body of the county drafts of ordinances for the purpose of carrying out the development pattern, or any part thereof, previously adopted by the commission, * * *." (emphasis added)

[ 599 ]

weight unless it is clearly contrary to the express language and intent of the Charter. Since we find the Charter to be ambiguous with regard to the procedures for adopting a comprehensive plan, we consider carefully the Board's interpretation of the Charter implicit in its implementation. The Board, by passing Ordinance 120[9] and following the procedures set out therein, has obviously interpreted the Charter as authorizing such procedures.

It is likely that the drafters of the Charter did not have in mind the procedures by which the county was to adopt a comprehensive plan. The drafters did, however, have the foresight to provide for the situation in which we find ourselves at this time. Section 22 of the Charter states:

"All powers, both legislative and administrative, of the county shall be vested in the board of county

_____

[9] At the time of its enactment in 1972, Ordinance 120 was the basic land use ordinance in Washington County. It established in new form the County Planning Commission and listed its structure and duties. It established the standards to be applied in drawing up and adopting comprehensive plans, and it set out detailed procedures by which the Planning Commission and the County Board of Commissioners would consider and adopt a plan. In addition, it repealed and reenacted with amendments the "Zoning Ordinance of Washington County." The procedures set out in Ordinance 120 for the consideration and adoption of a comprehensive plan may be summarized as follows:

(1) The Planning Commission must hold at least one public hearing on any proposed plan or amendment thereto with 10 days' advance public notice by newspaper publication;

(2) The plan itself must be available for public inspection at least 10 days prior to the hearing;

(3) The plan must be approved by at least five members (of nine) of the Planning Commission;

(4) The plan, with the Planning Commission's recommendation, must be forwarded to the Board of County Commissioners within 15 days of the action;

(5) The Board must receive the plan and recommendation and schedule at least one public hearing with the same notice and public inspection requirements as that outlined above;

(6) After the public hearing, the Board is empowered to adopt, reject, or adopt with modifications consistent with the standards referred to above, the proposed comprehensive plan;

(7) If modifications are made, the comprehensive plan is not to become effective until the Planning Commission concurs in the modifications.

commissioners as prescribed by this charter subject to the initiative and referendum powers reserved to the voters by the county. *All legislative powers not exercised by the voters shall be exercised by the board of county commissioners and executed as provided for by this charter, or if this charter makes no provision, as provided by ordinance or resolution of the board of county commissioners.* The administrative powers shall be exercised by the board of county commissioners or by persons under its authority." (emphasis added)

Here, then, is express authority from the people of Washington County for the Board to exercise and execute its legislative powers, in the absence of express provision in the charter, as the Board itself may provide by ordinance or resolution. Ordinance 120 makes such provision. It is not asserted that the procedure set out in Ordinance 120 was not followed or that the procedures followed deprived the plaintiff of constitutional due process (other than the allegation of inadequate notice discussed below). We therefore hold that the 1973 Comprehensive Framework Plan of Washington County was validly adopted.

■■ Although we hold that the Washington County Charter, as it existed at the time this case arose, did not require that a comprehensive plan be enacted by ordinance and therefore the 1973 Plan was validly adopted, we believe that, even had the charter required that a comprehensive plan be adopted with ordinance formalities, the procedures, mandated by Ordinance 120 and followed by the Board in adopting the 1973 Plan, were functionally equivalent to the ordinance enactment procedures prescribed by Section 50 of the Washington County Charter.

## The following chart compares the two procedures:

|  | Ordinance | Resolution and Order |
|---|---|---|
| *Source of Authority* | Sec. 50, Washington County Charter | Ordinance 120 |
| *"Readings" at Board Meetings* | Three (by title only upon unanimous consent) | None |
| *Public Hearings* | One (by Board) after 3d reading | Two—one by Planning Commission, one by Board |
| *Public Notice* | 4 days prior to each reading. Posting of Board agenda at county courthouse | 10 days before each public hearing. By newspaper publication |
| *Minimum Time Between First Public Notice and Final Adoption* | 18 days | 20 days |
| *Amendments to Proposed Plan* | Additional public reading and hearing | Modifications by Board remanded to Planning Commission for approval |
| *Voting* | Roll call—three of five | Planning Commission—5 of 9 Board—3 of 5 |
| *Public Availability* | Copy furnished upon request after introduction | Public inspection permitted at least 10 days prior to any public hearing |
| *Effective Date* | 30th day after enactment unless emergency clause, then upon enactment | Upon adoption by latter of Planning Commission or Board |
| *Availability of Referendum* | Upon petition within 90 days of enactment Plan inoperative until referendum | No provision |

■ The procedures are not identical; however, identity of provisions need not be the standard. The legal validity of the Ordinance 120 procedures must be measured by the policy sought to be furthered by the ordinance adoption procedures. Our analysis focuses

on how well the Ordinance 120 procedures effectuate the public policies embodied in the charter provisions. The four identifiable public policies represented by the procedural safeguards of the ordinance adoption provisions of Section 50 are:

(1) Meaningful opportunity for public input;

(2) Assurance of due deliberation and consideration by the governing body;

(3) Public accountability for decision making by members of the governing body; and

(4) Preservation of the people's right of referendum as guaranteed by the Oregon Constitution, Art VI, § 10, and the Washington County Charter (Section 50(e) and (f)).

*Public Input*

Meaningful opportunity for public input depends upon adequate notice, availability of a forum, and the opportunity for the public to inform itself of the issues. The notice provisions of the resolution procedures appear to us more effective in terms of advance warning and complete dissemination of information than those prescribed for the ordinance procedures.[10] The ordinance procedure would give better public access to the document itself, since it would require that a copy of the plan be furnished to anyone desiring one. However, this is required only after the ordinance is introduced, providing a minimum of 14 days to study it before it could be enacted. The resolution

---

[10] It might be noted here that had the county followed strictly the Section 50 ordinance procedure, including that of notice, the plan might be subject to attack for violation of the notice requirements of ORS 215.060, which states that:

"Action by the governing body of a county regarding the plan shall have no legal effect unless the governing body first conducts one or more public hearings on the plan and *unless 10 days' advance public notice of each of the hearings is published in a newspaper of general circulation in the county* or, in the case the plan as it is to be heard concerns only part of a county, is so published in the territory so concerned and unless a majority of the members of the governing body approves the action. The notice provisions of this section shall not restrict the giving of notice by other means, including mail, radio and television." (emphasis added)

procedure makes the plan available for public inspection a minimum of 20 days before passage is possible.

### Due Deliberation

Plaintiff, in its memorandum before this court, points to the number of readings as being one of the critical differences, relying on the language of *Greenberg v. Lee,* 196 Or 157, 178, 248 P2d 324 (1952), wherein this court stated that "[t]he required readings * * * are natural impediments to impetuous, impulsive, capricious or arbitrary legislation." A better safeguard of due deliberation than the pro forma readings (normally by title only) is the minimum time required between the first public notice of a proposed action and its enactment. The minimum time required for Ordinance 120 adoption is greater than that required for ordinance enactment. The ready availability of the "emergency clause" (with immediate effectiveness) vitiates the salutary effect, if any, of the 30-day delay in effective date of an ordinance.

### Accountability

Ordinance passage requires a majority roll call vote by the Board of Commissioners, while the Ordinance 120/resolution procedures require a majority vote by both the Planning Commission and by the Board of County Commissioners. Amendment procedures are similar. For an amendment to a *proposed* ordinance, an additional "reading" and hearing are required; where the Board of Commissioners amends a plan recommended by the Planning Commission, the latter must approve any modifications.

### Referendum

■ The tradition of initiative and referendum is a strong one in Oregon. It is guaranteed to county voters by Art VI, § 10, of the Oregon Constitution, which states, in pertinent part:

"The * * * referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative * * * to legislation

passed by counties which have adopted [a home rule] charter."

Although the right of referendum in the Washington County Charter (Section 50) is applicable, by its own terms, only to "ordinances," it cannot nullify the right of referendum guaranteed by the Oregon Constitution. Since a comprehensive plan is "legislative * * * in nature," *Baker v. City of Milwaukie, supra,* its adoption would be subject to the referendum right of the people of Washington County. *See Allison v. Washington County,* 24 Or App 571, 587-588, 548 P2d 188 (1976).

The foregoing comparison reveals that the two procedures, while not identical, address themselves to the same basic policies of providing adequate procedural safeguards to protect the integrity of the adoption process. In *Baker v. City of Milwaukie,* 271 Or 500, 510-511, 533 P2d 772 (1975), this court reaffirmed its reliance on substance over form in the adoption of legislative enactments by local governments. To hold now that "substance" depends not on the fulfillment of basic policy considerations but on "formality" would vitiate this principle in its application.

In summary, we hold that the 1973 Comprehensive Framework Plan of Washington County was validly adopted. Our reversal of the Court of Appeals on this point revives several issues not considered below.

## II. REVIVED ISSUES

### A. Notice

■ The first set of revived issues concerns two additional attacks on the procedural validity of the entire plan. Firstly, plaintiff alleges that the notice required by ORS 215.060[11] of the public hearing by the county board on the 1973 Plan adoption was inadequate.

---

[11] *See* footnote 10, *supra.*

The following notice appeared in newspapers of general circulation in Washington County at least 10 days prior to the hearing on the comprehensive plan:

"NOTICE OF PUBLIC HEARING WASHINGTON COUNTY COMPREHENSIVE PLAN REVISION

"Notice is hereby given that a public hearing will be held before the Washington County Board of County Commissioners on Tuesday, November 27, 1973, at 7:30 o'clock p.m. P.S.T. in Room 402 of the Administration Building of the Washington County Courthouse Complex at 150 N. First Street, Hillsboro, Oregon.

"This hearing will concern a certain proposal to recommend adoption by the Board of County Commissioners of Washington County of a 'Comprehensive Framework Plan' for Washington County consisting of a text of approximately 150 pages and maps, a revision of the adopted Comprehensive Plans of Washington County pursuant to ORS chapter 215, as amended by Chapter 80 and 552, Oregon Laws 1973 and Article I of the Community Development Ordinance of Washington County.

"The proposed Comprehensive Framework Plan is on file with the Director of Records and Elections of Washington County, the title of such document being '1973 Revision, Comprehensive Plan (General) for Washington County, Oregon.'

"All persons having an interest in the above matter are invited to appear and be heard."

The content requirement of the notice prescribed by ORS 215.060 has not been previously determined. For the standards by which the present notice is to be judged we may look to the law which has developed regarding notice requirements for similar legislative actions, e.g., the adoption of a zoning ordinance.[12]

---

[12]The notice requirement mandated by ORS 215.223(1) for the adoption of zoning ordinances is nearly identical to that given in ORS 215.060. In *Clackamas County v. Emmert,* 14 Or App 493, 498, 513 P2d 532 (1973), the Court of Appeals held that the content requirement of the zoning notice was satisfied where the notice "reasonably apprised [the recipients] that their * * * property was included, that zoning was contemplated therefor and * * * when and where they could be heard thereon." Based on this standard, the notice for the (zoning) Ordinance 125 hearing was validated by the Court of Appeals in the present case below. *Fifth Avenue Corporation v. Washington County,* 28 Or App 485, 488-490, 560 P2d 653 (1977).

The law in this regard from all jurisdictions is collected in Anno: Validity and Construction of Statutory Notice Requirements Prerequisite to Adoption of Amendment of Zoning Ordinance or Regulation, 96 ALR2d 449 (1964). The general requirement given there is that the contents of the notice must "reasonably apprise those interested that the contemplated action is pending." 96 ALR2d at 497. In particular, the notice must designate the property involved in the proposed action such that "the recipients of the notice can reasonably ascertain from it that property in which they are interested *may* be affected by the enactment." (emphasis added) 96 ALR2d at 504.

When judged by the foregoing standards, the contents of the notice in question are in accord with the statutory notice requirements. The proposed Comprehensive Plan would affect, at least potentially, all land in Washington County. The contents of the notice reasonably apprised its recipients of the geographical scope of the proposed action in addition to specifying the nature of the contemplated action.[13] We affirm the trial court in its determination of the legal sufficiency of the notice in question.

### B. Planning Commission Report

A second attack was based on the admitted failure of the board to request the planning commission to provide a report and recommendation regarding the proposed changes in the pre-existing plan to be affected by adoption of the 1973 Plan. Plaintiff based this attack on ORS 215.110(3), which states in pertinent part:

> "The governing body may also enact, amend or repeal with reference to *any subject mentioned in subsection (1)* of this section, an ordinance *on which the governing body initiates action,* provided that it first requests from the

---

[13] It may be noted here that the trial court found as a fact that plaintiff's agents had prior actual notice of the contemplated changes in the 1973 Plan. Since the trial court found, as we do, that the public notice was legally sufficient, the trial court declined to rule on the legal import of such actual notice.

commission a report and recommendation regarding the ordinance and allows a reasonable time for submission of the report and recommendation." (Emphasis added).

This assertion is without merit, since the application of ORS 215.110(3) is limited by its own terms (*see* italicized portion). First of all, it is limited to those situations where the governing body (County Board), as opposed to the Planning Commission, is the forum where the action is initiated. In the present case, pursuant to the Ordinance 120 procedures, action was initiated by the Planning Commission. Secondly, this provision applies only to subjects mentioned in ORS 215.110(1)—"ordinances intended to carry out part or all of the comprehensive plan adopted by the commission." It defies logic to construe this provision as applicable to the adoption of the plan itself. *See Sunnyside Neighborhood v. Clackamas Co. Comm.,* 280 Or 3, 7-8, 569 P2d 1063 (1977).

Therefore, as we have seen, each of the three attacks on the validity of the 1973 Comprehensive Framework Plan of Washington County fails, and the Plan is valid and binding.

## C. Inverse Condemnation

A second set of issues, mooted by the Court of Appeals holding that the 1973 Plan was invalid, but revived by our reversal on that point, involves inverse condemnation. Plaintiff alleged that defendant, through its enactment of Zoning Ordinance 125 and its adoption of the 1973 Plan, had rendered the subject property "substantially valueless" and had deprived plaintiff "totally of the economic use and benefit of the subject property." In one count, plaintiff sought compensation for the fair market value of the subject property; in another, alternatively, it sought the rental value of the subject property from the date of rezoning to the date of action. The trial court sustained defendant's demurrer to each cause of action, reasoning that plaintiff's allegations of the new zoning

[ 608 ]

designations showed a substantial beneficial use retained by the plaintiff in the subject property on the face of the complaint. Although the trial court was correct in its ruling, we feel the issue requires further amplification. For the purpose of the following discussion, we must divide the subject property into two separate parcels: (1) the bulk of the property which the zoning ordinance and 1973 Plan designated as "commerical" and "residential," and (2) a small portion which the 1973 Plan designated as "transit station" and a larger portion which the 1973 Plan designated as "Greenway."[14]

With regard to the first portion, the trial court's ruling, based on the fact that the complaint showed on its face that the "down zoning" involved did not deprive plaintiff of all substantial beneficial use of its property, was correct. Where a zoning designation allows a landowner some substantial beneficial use of his property, the landowner is not deprived of his property nor is his property "taken." Such a loss, if any, is "damnum absque injuria." *See, e.g., Oregon Investment Co. v. Schrunk,* 242 Or 63, 71, 408 P2d 89 (1965); *Morris v. City of Salem et al,* 179 Or 666, 673, 174 P2d 192 (1946); *Kroner v. City of Portland et al,* 116 Or 141, 151-152, 240 P 536 (1925); *Joyce v. City of Portland,* 24 Or App 689, 692, 546 P2d 1100 (1976); *Multnomah County v. Howell,* 9 Or App 374, 383, 496 P2d 235 (1972) *rev den. See also Goldblatt v. Hempstead,* 369 US 590, 592 (1961); *Petterson v. City of Naperville,* 9 Ill 2d 233, 137 NE2d 371, 380 (1956). This is not to say that the reverse is true, as we will see from our examination of the other two portions of plaintiff's property.

---

[14]These latter two portions were designated by the zoning ordinance as commercial. Between these two portions there may be a further distinction drawn: defendant had the legal power and right to institute condemnation proceedings with regard to the greenway area; however, the condemnation of private property for the purpose of establishing a transit station may be outside the ambit of defendant's condemning authority and may lie exclusively within the condemning authority of another agency.

■ With regard to the portions of plaintiff's property designated by the 1973 Plan as "transit station" and "greenway," the allegations of plaintiff's complaint that the use of this property retained by the plaintiff was "substantially valueless" were not contradicted by the complaint itself. While plaintiff did not differentiate the different designations at trial, we see no reason that such a theory may not be considered on appeal. If the complaint does allege facts sufficient to constitute a cause of action for inverse condemnation, even if the claim was overstated as to the extent of the taking, it is not subject to demurrer. *Cf. Kimbrough v. Smith,* 255 Or 123, 126, 464 P2d 696 (1970). The question squarely presented, then, is whether the mere designation for eventual public use of portions of plaintiff's property by the 1973 Plan constitutes a "taking" under Art I, § 18, of the Oregon Constitution, which states that "private property shall not be taken for public use * * * without just compensation."

Whether there has been a "taking" in this context has never been addressed by this court. It appears that the generally accepted rule is that "*mere* plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of property affected" (emphasis added). Annotation: Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected, 37 ALR3d 127, 132 (1971) and cases cited therein. The annotator summarizes the reasons given for this general rule as follows:

> "* * * that mere plotting and planning does not, in itself, amount to an invasion of property or deprive the owner of his use and enjoyment thereof; that the projected improvement may be abandoned by the condemnor and the property never actually disturbed; that the threat of condemnation is one of the conditions upon which an owner holds property; and that the general rule is in aid of the growth and expansion of municipalities." *Id.* at 139-140.

Some of the cases from which this "general rule" is derived involve documentary "Plans": *Bauman v.*

*Ross,* 167 US 548 (1897) (highway and subdivision plan); *Benedict v. New York,* 98 F 789 (2d Cir 1899) (aqueduct plan); *Martin v. US,* 240 F2d 326 (4th Cir 1957) (highway improvement plan); *Hempstead Warehouse Corp. v. US,* 120 Ct Cl 291, 98 F Supp 572 (1951) (airport expansion plan); *Weintraub v. Flood Control District,* 104 Ariz 566, 456 P2d 936 (1969) (flood control plan); *Selby Realty Co. v. City of San Buenaventura,* 10 Cal3d 110, 109 Cal Rptr 799, 514 P2d 111 (1973) (general plan); *Navajo Terminals, Inc. v. San Francisco Bay Conservation and Development Commission,* 46 Cal App3d 1, 120 Cal Rptr 108 (1975) (land use plan)[14a]; *Arnold v. Prince George's County,* 270 Md 285, 311 A2d 323 (1973) (master road plan); *Kingston East Realty Company v. State,* 133 NJ Super 234, 336 A2d 40 (1975) (highway alignment plan); *Re Philadelphia Parkway,* 250 Pa 257, 95 A 429 (1915) (street plan).

■ All the "plans" involved in these cases were characterized as being "merely tentative and subject to change." *See, e.g., Selby* at 116. It is questionable whether, in view of our characterization of the comprehensive plan in Oregon in *Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975), as "permanent in nature," *id.* at 513-514, and as dominating an inconsistent zoning designation allowing a more intensive use, *id.* at 506-508, these cases provide meaningful authority for the present one.[15]

---

[14a]The faulty legal characterization of the land use plan in *Navajo Terminals, Inc. v. San Francisco Bay Conservation and Development Commission,* 46 Cal App 3d 1, 120 Cal Rptr 108 (1975), as analogous to the more tentative "general plan" involved in *Selby Realty Co. v. City of San Buenaventura,* 10 Cal3d 110, 109 Cal Rptr 799, 514 P2d 111 (1973), is cogently criticized in Torpey, Inverse Condemnation, 16 Santa Clara L Rev 167 (1975).

[15]*Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975), established that, by virtue of ORS 197.175(2), the intensity of private land use or development contemplated in a comprehensive plan cannot be exceeded by a zoning ordinance. More intensive private development than that allowed by the plan is not likely to be reversible in favor of less intensive private use. The same is not necessarily true with respect to

A series of recent New York cases have addressed the more general issue of when a claim for just compensation will lie when a "police power" regulation, in effect, deprives the landowner of all substantial beneficial use of his property. In *Fred F. French Inv. Co., Inc. v. City of New York,* 39 NY2d 587, 385 NY Supp2d 5, 350 NE2d 381, *cert den* and *app dism* 97 S Ct 515 (1976), plaintiff was the effective owner of two private parks in an apartment complex in Manhattan. The zoning designation of the two parks permitted residential and office building development. The defendant-City amended the zoning ordinance, designating the parks exclusively for passive public recreational use with improvements as incidental to such use. The plaintiff in *French,* as does plaintiff here, made two claims for relief—both predicated on the defendant's action, which allegedly deprived the owner of any substantial beneficial use of its property. One claim sought a declaration of the invalidity of the zoning amendment as applied to the subject property, and the other, alternatively, sought damages for inverse condemnation. The Court of Appeals held there was no taking and therefore no right in the owner to compensation, and then declared the zoning amendment invalid as an unreasonable "police power" regulation. The court recognized the confusion which resulted from less than careful use of terms such as "taking" and "confiscation."[16] The Court of Appeals distinguished the two situations as follows:

eventual public acquisition of land tentatively designated as a site of a future public facility. There the question of the interim use of the land involves the eventual cost of the planned public use rather than its entire preclusion by allowing a present private use. Thus, until the landowner has explored what economically feasible private uses the city or county will permit pending the eventual taking for public use, its claim of inverse condemnation is premature.

[16]The New York court appears to have adopted terminology similarly confusing, calling the injury for which only declaratory relief will lie the "frustration" of plaintiff's property rights, while the injury which will support an inverse condemnation action is termed a "deprivation" of those

"The power of the State over private property extends from the regulation of its use under the police power to the actual taking of an easement or all or part of the fee under the eminent domain power. The distinction, although definable, between a compensable taking and a noncompensable regulation is not always susceptible of precise demarcation. Generally, as the court stated in *Lutheran Church in Amer. v. City of New York,* 35 N.Y.2d 121, 128-129, 359 N.Y.S.2d 7, 14, 316 N.E.2d 305, 310: '[G]overnment interference [with the use of private property] is based on one of two concepts—either the government is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good, or in its arbitral capacity, where it intervenes to straighten out situations in which the citizenry is in conflict over land use or where one person's use of his land is injurious to others. (Sax, Taking and the Police Power, 74 Yale L.J. 36, 62, 63.) Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation.

"'* * * * *

"'* * * As has been cogently pointed out by Professor Costonis: 'the goal of [challenges to regulatory measures] in conventional land use disputes is to preclude application of the measure to the restricted parcel on the basis of constitutional infirmity. What is achieved, in short, is declaratory relief. The sole exception to this mild outcome occurs where the challenged measure is either intended to eventuate in actual public ownership of the land or has already caused government to encroach on the land with trespassory consequences that are largely

rights. There is, in our opinion, a natural terminology based on the constitutional provisions from which the right to each of these remedies springs, the due process clause and the taking clause of the Fifth Amendment to the U.S. Constitution:

"No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The type of injury addressed by the former is the "deprivation" of property rights, while that addressed by the latter is the "taking" of them.

[ 613 ]

irreversible.' (Costonis, 'Fair' Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 1975 Col.L.Rev. 1021, 1035; * * *." 350 NE2d 384-386.

*See also Jensen v. City of New York,* 42 NY2d 1079, 369 NE2d 1179, 1180 (1977); *NY Tel. Co. v. Town of North Hempstead,* 41 NY2d 691, 363 NE2d 694, 697 (1977); *Charles v. Diamond,* 41 NY2d 318, 360 NE2d 1295, 1303 (1977).

■ ■ In summary, even if planning or zoning designates land for a public use and thereby effects some diminution in value of his land, the owner is not entitled to compensation for inverse condemnation unless: (1) he is precluded from all economically feasible private uses pending eventual taking for public use; or (2) the designation results in such governmental intrusion as to inflict virtually irreversible damage.[17] *Compare Charles v. Diamond, supra.* The complaint in the present case did not allege facts which, if proved at trial, would establish either of these two elements. Therefore, the trial court did not err in sustaining defendant's demurrer.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The doctrine of exhaustion is a simple one in statement but difficult in application. "Ordinarily, those who seek judicial relief must show they have exhausted their administrative remedies." *Oregon City v. Hartke,* 240 Or 35, 44, 400 P2d 255 (1965). *See also Myers v. Bethlehem Corporation,* 303 US 41, 58 S Ct 459, 82 L Ed2d 638 (1938); *Miller v. Schrunk,* 232 Or 383, 388, 375 P2d 823 (1962); *Willamette Valley Lumber Company v. State Tax Commission,* 226 Or 543, 359 P2d 98 (1961).

---

[17] We do not wish to limit the second exception to trespassory encroachments only, since we have already extended it to "repeated nontrespassory invasions called 'nuisance.'" *Thornburg v. Port of Portland,* 233 Or 178, 192, 376 P2d 100 (1963), quoted in *Lincoln Loan v. State Hwy. Comm.,* 274 Or 49, 56, 545 P2d 105 (1976).

In the recent case *Bay River, Inc. v. Environmental Quality Commission,* 26 Or App 717, 721-722, 554 P2d 620 (1976), the Court of Appeals stated:

"* * * The reasons for the exhaustion doctrine are many, but of greatest importance is a concern that the decision-making process should not be prematurely interrupted, especially when agency expertise will play a large role in any decision on the merits. *McKart v. United States,* 395 US 185, 89 S Ct 1657, 23 LEd2d 194 (1969); *See* K. Davis, *Administrative Law Treatise* § 20.06 (1958)."

At trial defendant moved for partial summary judgment with reference to plaintiff's allegations that the 1973 Plan and zone were unconstitutional *as applied* to the subject property on the basis that plaintiff had not exhausted its administrative remedies.[18] This important issue may be divided into three separate questions: (1) Were the nonjudicial remedies to be pursued by the plaintiff truly "administrative" or were they legislative in nature? (2) If "administrative," were these potential remedies truly available to the plaintiff at the time it filed suit for a declaratory judgment? (3) If available, were they adequate to address plaintiff's desire to use the subject property as plaintiff wished?

### (1) Administrative or Legislative

The threshold determination to the resolution of the first question is the nature of the relief plaintiff is seeking. It is clear that what plaintiff wants is the opportunity to build a "district shopping center" (*see* note 1 *supra*) on the subject property. It could not legally do this at the time it brought suit, because (1) Ordinance 125 rezoned the subject property to a designation which did not allow this use, and (2) the 1973 Plan proscribed such intensive use. Because of

_____
[18]There was general agreement below that such administrative remedies need not be exhausted before plaintiff could seek a judicial determination of the constitutionality of the Plan and/or the zoning ordinance *in its entirety. See Euclid v. Ambler Realty,* 272 US 365, 386 (1926). *See also Comment,* "The Delicate Art of Choosing a Judicial Remedy in Oregon Land Use Controversies," 55 Or L Rev 119, 134 (1976).

our conclusion in *Baker v. City of Milwaukie,* 271 Or 500, 514, 533 P2d 772 (1975), that "a zoning ordinance which allows a more intensive use than that prescribed in the plan must fail," the plaintiff was faced with the task of both obtaining a single tract comprehensive plan amendment (STCPA)[19] to allow the intensity of use it desired and then changing the zoning designation of the subject property to one authorizing such a use.

Plaintiff argues that both of these remedies are legislative in nature and, therefore, under the authority of *Oregon City v. Hartke, supra,* not subject to the exhaustion doctrine. In *Hartke* defendants appealed a conviction for violating a city zoning ordinance. The city argued that defendants were precluded from asserting the defense of unconstitutional application of the zoning ordinance to their property, because they had not exhausted their administrative remedies. This court disagreed, stating that (1) the remedy of a zone change "would appear to be legislative rather than administrative," and (2) even if administrative, the procedure by which defendant could initiate the required amendment was based upon obtaining the signatures of a certain percentage of neighbors in support of the amendment. *Id.* at 45. Finally, this court concluded that, whatever the nature of the remedy, a defendant subject to civil penalties was before the court seeking a determination of a constitutional application of the zoning ordinance, and it was "more practicable to now dispose of the question." *Id.* at 46.

This case, then, would be scant authority for plaintiff's proposition, even if the basic law of zoning had

---

[19]We use the term "single tract comprehensive plan amendment" advisedly. It is intended to be consistent with the usage employed in *Sunnyside Neighborhood v. Clackamas Co. Comm.,* 280 Or 3, 11 n.5, 569 P2d 1063 (1977). It is used descriptively—both to describe the single tract in question here and to distinguish this type of quasi-judicial comprehensive plan amendment from legislative amendments to a comprehensive plan. It is not intended to indicate that quasi-judicial comprehensive plan amendments are *limited* to those involving *single* tracts.

remained static from *Hartke* to the present. However, in 1973 this court considered what had been up to that time "settled law" that zoning amendment proceedings were legislative in nature. In *Fasano v. Washington County,* 264 Or 574, 581, 507 P2d 23 (1973), we adopted the following test to determine whether a zoning amendment proceeding was legislative or administrative:

> "* * * Basically, this test involves the determination of whether action produces a general rule or policy which is applicable to an open class of individuals, interest [sic], or situations, or whether it entails the application of a general rule or policy to specific individuals, interests, or situations. If the former determination is satisfied, there is legislative action; if the latter determination is satisfied, the action is [quasi-judicial and administrative]."

Under this test and subsequent applications by the Court of Appeals,[20] it is clear that both the zone

[20] *Ayres et al v. City Council of Cannon Beach,* 31 Or App 1337, 572 P2d 664 (1977); *Bienz v. City of Dayton,* 29 Or App 761, 566 P2d 904 (1977); *Petersen v. Klamath Falls,* 27 Or App 225, 555 P2d 801 (1976), *rev'd* 279 Or 249, 566 P2d 1193 (1977); *Joyce v. City of Portland,* 24 Or App 689, 546 P2d 1100 (1976); *Rockway v. Stefani,* 23 Or App 639, 543 P2d 1089 (1975); *Parelius v. City of Lake Oswego,* 22 Or App 429, 539 P2d 1123 (1975); *Shanks v. Washington County,* 22 Or App 426, 539 P2d 1111 (1975); *Green v. City of Eugene,* 22 Or App 231, 538 P2d 368 (1975); *Auckland v. Board of County Commissioners of Multnomah County,* 21 Or App 596, 536 P2d 444 (1975); *Tierney v. Duris,* 21 Or App 613, 536 P2d 435 (1975); *South Central Association of Neighborhoods, Inc. v. Lindsey,* 21 Or App 578, 535 P2d 1381 (1975); *Duddles v. City Council of West Linn,* 21 Or App 310, 535 P2d 583 (1975); *Dickinson v. Board of County Commissioners,* 21 Or App 98, 533 P2d 1395 (1975); *Marggi v. Ruecker,* 20 Or App 669, 533 P2d 1302 (1975); *Culver v. Dagg,* 20 Or App 647, 532 P2d 1127 (1975); *Marion County Fire District No. 1 v. Marion-Polk County Boundary Commission,* 19 Or App 108, 526 P2d 1031 (1974); *West v. City of Astoria,* 18 Or App 212, 524 P2d 1216 (1974); *The Inn, Home for Boys v. Portland City Council,* 16 Or App 497, 519 P2d 390 (1974); *Bergford v. Clackamas County,* 15 Or App 362, 515 P2d 1345 (1973); and *Millersberg Development Corporation v. Mullen,* 14 Or App 614, 514 P2d 367 (1973). *See also* Coon, The Initial Characterization of Land Use Decisions, 6 Env. L. 121 (1975).

In the *Auckland* case, *supra,* the Court of Appeals stated:

> "Whenever one seeks to use property in a manner that is not an outright permitted use, and must therefore obtain governmental approval, the necessary governmental proceedings are quasi-judicial in

change and the STCPA required by the plaintiff to accomplish its purpose are administrative, quasi-judicial remedies and must be exhausted before judicial review can be allowed, subject to the two additional considerations below.

### (2) Availability

It goes without saying that for an administrative remedy to be "exhaustible" it must be available. Defendant in a memorandum and affidavit supporting its motion for partial summary judgment filed on October 21, 1975, asserted the existence of administrative procedures mandated by county ordinance by which the plaintiff could have sought (1) an STCPA (Ordinance 167) and (2) a change of the zoning map (Chapter 2200, Community Development Ordinance). Defendant in its brief before the Court of Appeals and in oral argument before this court likewise asserted the availability of these procedures. However, a careful examination of the complete text of Ordinance 167 (defendant's Exhibit 25 at trial) reveals that it was not passed until May 27, 1975—fully five months *after* plaintiff filed its suit for declaratory judgment. Plaintiff, for its part, did not complain that this remedy was not available at the time. The other remedy—a zone change—standing alone would not accomplish plaintiff's purpose, since, as indicated earlier, a zone change without a plan amendment would create a so-called *Baker* conflict (see discussion in the following section).

Notwithstanding the unavailability of the Ordinance 167 plan amendment procedure, was there still an adequate remedy by which plaintiff could have and should have sought the required amendment? We hold

---

nature within the meaning of *[Fasano]*. This is true whether the other-than-permitted use is sought by way of a zone change, comprehensive plan change, conditional use permit, variance, or as in this case, 'a reclassification.' The labels are not controlling. Instead, *Fasano* is applicable when land-use decisions affect specific individuals and involve application of general rules to individual interests." 21 Or App at 601.

there was. Chapter 2200 of the Community Development Ordinance, cited by the defendant as incorporating the zone change procedures, is equally applicable to plan amendments of the type necessitated by the plaintiff's goal.

The primary basis for the applicability of the Chapter 2200 procedures to a STCPA is the scope of the chapter given therein. Section 2201-1.2 provides:

"This chapter shall be the sole manner in which administrative action is accomplished * * *"

Administrative action is defined as:

"* * * a proceeding * * * [i]n which the legal rights, duties or privileges of specific parties are determined only after a hearing in which such parties are entitled to appear and be heard * * *" § 2201-1.1

This definition, with its obvious circularity, is designed to encompass all "actions" which have been judicially defined as quasi-judicial. *See Fasano v. Washington Co. Comm.*, 264 Or 574, 588, 507 P2d 23 (1973). STCPA's have been so defined. *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 11 n.5, 569 P2d 1063 (1977).

There is, however, one specific provision in Chapter 2200 which, at least on the surface, appears to cast doubt on the applicability of these procedures to STCPA's. Section 2201-3.3(b) provides:

"*The burden of proof* is placed upon the petitioner seeking an action pursuant to the provisions of this Chapter. Unless otherwise provided for in this Article such burden shall be to prove:

"(1) Granting the request is in the public interest; the greater departure from present land use patterns, the greater the burden of the applicant;

"(2) The public interest is best carried out by granting the petition for the proposed action, and that interest is best served by granting the petition at this time.

"(3) *The proposed action fully accords with the applicable map elements of the relevant Comprehensive Plan* and also the goals and policies of the plan.

[ 619 ]

"(4) The factors listed in ORS 215.055 were consciously considered. These facts include:

"* * * the public health, safety and general welfare and shall be based on the following considerations, among others: The various characteristics of the various areas in the county, the suitability of the areas for particular land uses and improvements, the land uses and improvements in the areas, trends in land improvement, density of development, property values, the needs of economic enterprises in the future development of the areas, needed access to particular sites in the areas, natural resources of the county and prospective needs for development thereof, and the public need for healthful, safe, aesthetic surroundings and conditions. * * *"

"Proof of change in a neighborhood or community or mistake in the planning or zoning for the property under consideration are *additional relevant factors to consider*." (emphasis added)

References in the underscored portion to the "applicable map elements of the relevant Comprehensive Plan" appear to be inconsistent with a petition which seeks to amend such map elements as they pertain to a single tract. Where, as here, an incongruity results from the literal application of this one element of the burden of proof, it would be more consistent with the broad scope of Chapter 2200 to view the literal language underscored as applicable only where appropriate than to declare the Chapter 2200 procedures inapplicable in toto to petitions for single tract comprehensive plan amendments. We hasten to note that the second part of Section 2201-3.3(b)(3), that the proposed action fully accords with the *goals and policies* of the comprehensive plan, is one of the factors which this court recently held to be part of the petitioner's burden of proof when seeking a single tract comprehensive plan amendment. *Sunnyside Neighborhood v. Clackamas Co. Comm., supra* at 11-16 and 18.

We have previously noted plaintiff's need to seek both a change in the zoning designation of the subject

property and a single tract comprehensive plan amendment covering the subject property.[21] The four elements of the petitioner's burden of proof set out in Section 2201-3.3(b) are well formulated for establishing the petitioner's right to *both* of the changes he is required to seek. *See Fasano v. Washington Co. Comm., supra,* and *Sunnyside Neighborhood v. Clackamas Co. Comm., supra.*

Notwithstanding defendant's repeated error in asserting the availability of the Ordinance 167 procedures[22] at the critical time period, administrative procedures, independent of Ordinance 167, did exist at the time plaintiff filed its suit for declaratory judgment whereby plaintiff could have petitioned the Board for a single tract comprehensive plan amendment, the granting of which would have made the present suit unnecessary.

### (3) Adequacy

Plaintiff in its memorandum in opposition to defendant's motion for summary judgment and in its brief before the Court of Appeals, argued that any attempt by plaintiff to exhaust the existing administrative remedies would have been futile, thereby excusing such exhaustion. As authority for the

---

[21] In *Tierney v. Duris,* 21 Or App 613, 536 P2d 435 (1975), the Court of Appeals gave its approval to a single hearing (or set of hearings) process in a case such as the present one where both plan and zone amendments are required:

"Although local governments are free to choose to follow such procedures [parallel hearings], the law does not require that every individual land-use determination consume as much governmental time. An amendment to the comprehensive plan and an amendment to a zoning ordinance that both affect an individual piece of property can be considered simultaneously in a single proceeding."

In the interest of efficiency and conservation of increasingly burdened governmental resources, we heartily echo this approval.

[22] It may be noted here that the present discussion would not have been avoided even had the Ordinance 167 procedures been truly available to the plaintiff at the time it filed suit. Ordinance 167 expressly mandates the Chapter 2200 procedures as applicable generally to single tract comprehensive plan amendments and the burden of proof set out in Section 2201-3.3(b) in particular.

"exception" to the exhaustion doctrine, plaintiff cites generally 3 Davis, Administrative Law Treatise § 20.07 at 99 (1958). The statement referred to indicates only that "*[s]ome* authority supports the proposition that if following the administrative remedy would be futile because of certainty of an adverse decision, administrative remedy need not be exhausted." (emphasis added) The only Oregon case cited by plaintiff (in its summary judgment memorandum), *Parks v. Tillamook County Commissioners,* 11 Or App 77, 501 P2d 85 (1972), is applicable only by analogy, since it involves the demand requirement in a mandamus action. Thus, the legal issue is not settled—either in Oregon or in other jurisdictions. However, it is not necessary for us to determine the proper rule in this jurisdiction, since even if we assume *arguendo* the rule to be as plaintiff asserts, plaintiff's showing of a factual basis for it in its affidavits opposing defendant's motion for summary judgment does not in any way indicate the "certainty of an adverse decision" on the merits of plaintiff's claim.

Plaintiff, therefore, had adequate administrative remedies available to it at the time it filed its suit for declaratory judgment; consequently, the trial court did not err in granting defendant's motion for partial summary judgment on those allegations which could have been addressed by such administrative remedies.[23]

---

[23] Another and separate issue involving exhaustion of administrative remedies was raised, apparently *sua sponte,* by the Court of Appeals below and was occasioned by that court's invalidation of the 1973 Plan. 28 Or App 485, 494. Since we have reversed that invalidation, that issue no longer commands our attention. However, lest the bar attach significance to the substance of that discussion, we state that it is expressly disapproved. The situation which the Court of Appeals created by its invalidation of the 1973 Plan was not, as implied by that court, a *Baker* conflict situation. 28 Or App at 494-496. *See Baker v. City of Milwaukie,* 271 Or 500, 510, n.10, 553 P2d 722 (1975). *See also Marracci v. City of Scappoose,* 26 Or App 131, 133-134, 552 P2d 552 (1976). A second misconception below was the refusal to apply the doctrine of exhaustion to a true *Baker* conflict. The determination and resolution of such a conflict would involve the interpretation of

In summary, we hold that (1) the 1973 Plan was validly adopted; (2) plaintiff has not stated a cause of action for inverse condemnation; and (3) plaintiff's claim that the zoning ordinance and 1973 Plan were arbitrary and capricious as applied to the plaintiff's property is subject to the exhaustion doctrine. The judgment of the Court of Appeals is reversed and that of the trial court is affirmed in full.

---

both the local comprehensive plan and the allegedly offending zoning ordinance. In *Green v. Hayward,* 275 Or 693, 706, 552 P2d 815 (1976), we stated:

> "The appropriate place for both an initial interpretation of a comprehensive plan and a determination whether a proposed change complies with the specifics of the plan as properly interpreted is at the local level where the governing body is familiar with the plan and its implementation, and has heard the evidence at first hand."

The effect of this requirement will be to further the aims of the doctrine itself—to shortcut the lengthy and expensive litigation process, to allow a body with specialized expertise to determine, at least initially, factual and policy questions with which it is familiar, and, if litigation does result, to provide the reviewing court with a complete and well organized record upon which it may base its judgment.